NATHAN H. WARREN ET AL., APPELLANTS, V. ELLA W. PEABODY ET AL., APPELLEES.

[FILED JULY 11, 1889.]

The Evidence considered, and *held*, to sustain the findings and decree of the district court.

ERROR to the district court for Fillmore county. Tried below before MORRIS, J.

*John P. Maule*, for plaintiff in error, cited: *Parchen v. Anderson*, 5 Pac. Rep., 588; *Culley v. Edwards*, 51 Am. Rep., 614; Pomeroy's Equity, vol. 1, sec. 105; 1 Perry on Trusts, sec. 166; *Cook v. Tullis*, 18 Wall., 332.

*O. P. Mason*, for defendant in error, Williams, cited:. *Weil v. Lankins*, 3 Neb., 387; *Weinland v. Cochran*, 9 Id., 482; *Crowell v. Horacek*, 12 Id., 625.

COBB, J.

This cause was appealed from the decision of the district court of Fillmore county.    Nathan H. Warren, Cyrus T. Warren, and Charles C. Warren, appellants, allege that they are partners doing business in Chicago, Illinois, under the firm name of N. H. Warren & Co., not incorporated; that they are grain commission merchants and own a number of grain elevators in this state, where they have persons buy grain for them upon such terms as they may agree upon; that on July 24, 1884, James Peabody and H. F. Googins commenced buying grain in Fairmont, Fillmore county, and shipping the same to them in Chicago, using an elevator in Fairmont owned by plaintiffs.    That plaintiffs furnished the money to buy the grain ; Googins lived in Chicago, and Peabody in Fairmont, and managed the business without having any money in it; and had no money anyhow, having formerly been a clerk or employed in the office of the Burlington & Missouri River R. R. Co.    On September 30, 1885, the plaintiffs bought of Googins his interest in the business, and from that time at Fairmont it was conducted in the name of Jas. Peabody & Co., the firm being James Peabody and the plaintiffs; that they continued the business there till August 1, 1886, when it expired by limitation.    It is alleged that Peabody never had any money in the business of the last partnership, but that the plaintiffs furnished all the money for the purchase of grain, for which purpose, exclusively, the partnership was formed; that Peabody would draw on them, from time to time, ostensibly for carrying on the legitimate business of the partnership, the purchase of grain.    The plaintiffs in Chicago knew nothing about what Peabody was doing except

15

as reported by him, and his reports were always that the money was being used for the purchase of grain, and that large amounts of grain were on hand, etc.

It is alleged that Peabody, not being satisfied with his limited and legitimate sphere of a country grain buyer and shipper, undertook to build railroads and water works, and to operate transportation companies with the money of plaintiffs, diverting it from the purchase of grain. That desiring a home and domicile for himself and Ella W. Peabody, his wife, he purchased, with the money of the plaintiffs, lots six, seven, and eight in the Park addition to Fairmont, and had the lots deeded to his wife. He then erected a valuable dwelling house and out-buildings, paying for the same in like manner, with money sent to buy grain, the amount of $5,000, without the knowledge or consent of plaintiffs.

It is also alleged that Harriet W. Williams is the mother of Ella W. Peabody, and that on August 2, 1886, Peabody and his wife, anticipating a suit by the plaintiffs, to set aside the deed to Ella W. Peabody for said lots, and have the title decreed to be in them, and for the purpose of defrauding the plaintiffs, and without any consideration from Harriet W. Williams, executed to her a mortgage on said lots for the sum of $2,000 ; that the mortgage was never delivered to her, and that she did not know of its execution, but that the same was at the instance of Peabody and his wife without the knowledge of the mortgagee. It is further alleged that Peabody and his wife are insolvent and execution proof.

The prayer is that the mortgage be declared null and void; that it be found that the lots, dwelling house, and improvements were purchased and built with the money of the plaintiffs, to whom the real property shall be conveyed by Peabody and wife, and for general relief, etc.

The defendants, James Peabody and Ella W. Peabody, answering, deny every allegation of the plaintiffs except

those admitted by them to be true. Peabody admits that he was a member of a copartnership with Googins, whose interest was purchased by the plaintiffs and was carried on under the firm name of Jas. Peabody & Co. until August 1, 1886. They admit that they purchased lots Nos. 6, 7, and 8 in the Park addition to Fairmont, and that the same were bought and paid for before the plaintiffs entered into copartnership with defendant Peabody, and that at the time the lots were bought he was not indebted to the plaintiffs in any sum whatever, and that the house which defendants built on the lots was nearly completed when the partnership was formed between the plaintiffs and defendant; that defendant Peabody says that no settlement of the partnership has been had between the plaintiffs and himself, and that he has many times, before and since the dissolution, demanded a settlement, and says that he does not owe anything to the plaintiffs, and especially denies that he is insolvent, or unable to pay his just indebtedness. These defendants say that the house and lots mentioned constitute their homestead, and at the commencement of this action, and for a long time prior, said premises were occupied by them as their homestead and continue so to the present. They admit that the premises were mortgaged to Harriet W. Williams, and that they received as a consideration therefor $2,000 in cash from the mortgagee.

The plaintiffs reply, denying all the allegations of the answer.

The defendant, Harriet W. Williams, answering, admits the partnership of the plaintiffs and the defendant as Jas. Peabody & Co. at Fairmont, Nebraska, in the grain business, but denies that the plaintiffs furnished or advanced any money to Peabody and Googins while they were doing business at Fairmont or while they were together, except as advances on the shipments of grain to them, and admits that on September 30, 1885, the plaintiffs purchased the interest of Googins in the business for $4,500; that Googins

lived in Chicago and was an equal partner with Peabody, whose interest was one-half, and worth equally as much as that of Googins, and that the plaintiffs and Peabody were from that time equal partners in said business at Fairmont; and defendant denies that Peabody never had any money in the business of Jas. Peabody & Co., and denies that the plaintiffs furnished all the money for the purchase of grain, or that the partnership was formed exclusively for the purchase of grain, but was formed for buying and selling and for receiving and storing grain, and it was agreed that the plaintiffs were to furnish the money to purchase the grain with, and after the plaintiffs had purchased the interest of Googins, Peabody was to buy and ship, and sell, or consign grain to the plaintiffs, and was to draw on the plaintiffs for money to carry on the business and was to share alike in the profits and loss. The defendant denies that the plaintiffs knew nothing of what Peabody was doing, but alleges that they secured from him monthly statements showing the exact situation of the business; and denies that he conceived the building of water works, or railroads, or operating transportation companies, or that he actually entered into the prosecution of the same; but admits Peabody invested money in the water works at Fairmont, and there is due seven or eight thousand dollars from that village, with the knowledge and consent of plaintiffs, and the claim is assigned to plaintiffs, who are proceeding to collect it. The defendant admits that James Peabody is married and the head of a family, and denies that he purchased with the money or the means of the plaintiffs the lots mentioned, or used any of the money of the plaintiffs therefor, but that the same were purchased with his wife's money and were deeded to her, and are now held by her, subject to the mortgage before mentioned to defendant. She admits that Peabody, out of the money loaned him and his wife by defendant, built a dwelling house upon the lots, and used no money belonging to the plaintiffs therefor,

and denies that any money sent to Peabody to purchase grain with was used in purchasing the lots or erecting the dwelling house thereon. She denies that she is the mother of Ella W. Peabody or that James Peabody is her son-in-law, and she denies each and every allegation of the paragraph in the plaintiffs' petition, that "on August 2, 1886, James and Ella W. Peabody, in anticipation of a suit being commenced by the plaintiffs, to set aside the deeds to said lots, and have the title of the deed declared to be in them, and for the purpose of defrauding the rights of these plaintiffs, and without any consideration whatever from the said Harriet W. Williams, who lives in the state of New York, and was not in Nebraska on August 2, 1886, executed to said Harriet W. Williams a mortgage on said lots for the sum of $2,000;" and this defendant denies every statement, averment, and fact set forth in the foregoing paragraph of the petition as the same is therein alleged. And she denies that the mortgage was never delivered to her, and denies that she did not know of its execution; and she says that she is the wife of John L. Williams, and that after some family discussion and negotiation it was arranged that $2,000 should be loaned to the brother, James Peabody, who agreed at the time that he would give security upon the house and lots mentioned; that she parted with the money upon the faith, agreement, and expectation that a mortgage would be issued by James Peabody and wife to secure the payment of said $2,000 and the interest, and she remitted to said James Peabody, who, in pursuance of said agreement, made, executed, and acknowledged said mortgage to defendant to secure said $2,000 so advanced to him, and he, at the request of defendant, had the mortgage recorded, all of which was done at the time of and contemporaneously with said loan. And the defendant, in good faith and for said consideration of $2,000, through her brother, accepted said mortgage without any knowledge, information, or notice that the plaintiffs have or claimed to have an equita-

ble or any other lien upon said premises; and she is an innocent holder of said security and mortgage for value, and in good faith; and that she had no knowledge of the dealings between the plaintiffs and her co-defendants. She prays that her mortgage to secure said $2,000 be decreed to be a first lien upon said lots and premises; and for further relief, etc.

The plaintiffs reply to this answer, denying all the allegations of the defendant. These pleadings constitute the issue in the case.

There was a trial to the court, which found upon the proofs adduced that the allegations of the plaintiffs' petition were not sustained, and therefore found in favor of the defendants and against the plaintiffs, with a judgment that the plaintiffs take nothing by this action, that the cause be dismissed, and that the defendants go hence without day and recover their costs.

To all of which the appellants except.

It appears from the bill of exceptions that on March 30, 1884, H. F. Googins, Alvah Perry, Sarah A. Scott, and James Peabody executed a contract to enter into copartnership under the firm name of Peabody, Perry, Scott & Company for the purpose of conducting a commercial business of such character, and at such place, as might from time to time be mutually agreed upon; that the copartners should contribute to the capital of the firm each $3,000, excepting James Peabody, who should contribute no money to the capital stock, but that his business experience and friendly relations with the Chicago, Burlington & Quincy Railroad Company should be considered and accepted by the other partners as a full equivalent of the sum to be contributed; that each of the partners who should devote his time exclusively towards the conduct of the business of the firm should receive compensation not exceeding $100 per month, and except as stipulated, neither party, except by the unanimous consent in writing of ... should with-

draw from the general fund of the firm any sum whatever until July 1, 1885, when an inventory of assets and liabilities being had, such amounts might be withdrawn as should be agreed upon; provided, however, that the original contribution of each party, as specified, should remain *intact*, as the capital of the firm, until the expiration of the contract; that neither of the copartners, severally or jointly, should enter into any contract involving the location or establishing of new enterprises, or the employment of more than the amount of capital specified in the contract without the consent of all the parties thereto; that during the life of the contract neither of the copartners, severally or jointly, should engage in any speculation, deals in stock, grain, or other product, but should confine their transactions to a strictly commercial business, and with other specific provisions not deemed important to set forth; that the contract of partnership should take effect July 1, 1884, and continue in force till July 1, 1886, and thereafter, until a written notice, for three months, should be given by one or more of the copartners of an intention to withdraw, to each of the others.

It appears that H. F. Googins paid in the $3,000; that Alvah Perry paid $1,000 and no more, and that Sarah A. Scott failed to pay any sum of her proportion; that Googins and Peabody, on August 24, 1884, entered into a written agreement reciting the copartnership contract and the failure of Perry and Scott to comply with its terms, and declaring it to be their agreement that the firm be changed to Peabody & Company, and that the copartnership contract should remain in full force except as to Perry and Scott, who were excluded from all partnership therein. Upon the execution of this agreement the firm of Peabody & Co. commenced business at Fairmont. The plaintiffs, N. II. Warren & Co., were the owners of elevators for the reception and storage of grain at Fairmont and Geneva, which were used and occupied for that purpose by Peabody

& Co. in buying and shipping grain.  At what time, or upon what terms, this firm first occupied the elevators, or what relations by contract, or commercial usage, existed between it and the owners of the elevators it is not possible to state from the record of the case.  N. H. Warren, of the plaintiff's firm, whose deposition was read upon the trial, was asked the question, What arrangements, if any, did the plaintiffs have with Peabody & Co. in relation to furnishing them money to carry on the business?

A.  They were to furnish the money to do the business, but in case they were blocked and could not get cars, we agreed they might draw for $3,000.

Q.  State whether Peabody understood the arrangement.

A.  I think there was no definite arrangement made, except that he was to furnish the money to buy the grain and ship to us.

Q.  Under what circumstances was he to draw upon the plaintiffs for grain purchased?

A.  He was to draw upon shipments of grain.

This firm of Peabody & Co., consisting of James Peabody and H. F. Googins, continued in business until about September 30, 1885, when the plaintiffs purchased the interest of Googins in the firm.  Up to this time I am unable to discover that there were any trust relations existing between the defendant James Peabody and the plaintiffs.

It is claimed in the appellants' brief that in consideration of the use of the elevators, the firm of Peabody & Co. was to pay one-half of the profits to the firm of N. H. Warren & Co.  I am unable to find this obligation in the record, but as the record is voluminous, and without an index, it may have been overlooked.  But if such were the terms upon which Peabody & Co. accepted and used the elevators, that fact did not create the relationship of partners between the two firms, or the members of either. In this I but state the position of appellants in their brief. (See page 10.)

The same relationship then existed between those two firms as commonly exists between any western firm of grain buyers and a firm of like dealers at Chicago or St. Louis to which they are in the habit of shipping grain, and upon which they draw for advances and sales. It is true, Warren states that in case Peabody & Co. were blocked and could not get cars, his firm agreed that they might draw $3,000, but it does not appear, in the case, that they were *blocked* at any time, or could not get cars for shipments; nor does it appear directly that they availed themselves of the privilege of drawing $3,000. It does appear, however, from the deposition of Warren that at the time of the purchase of the interest of Googins by N. H. Warren & Co., the firm of Peabody & Co. owed the plaintiffs $7,397.19, but it does not appear from the testimony of Warren, or that of any other witness, that this indebtedness bore any other character than that of an ordinary contract debt.

Exhibit E, introduced in evidence by the plaintiffs, is the only direct evidence showing the dates and amounts of money expended by James Peabody in the erection of the house and improvements involved in this controversy, by which it appears that checks to the amount of $800 were drawn in payment of labor, material, and furniture supposed to have gone into the building of the house and the improvement of the property. These items appear to have been selected from the account books of James Peabody & Co., which is alleged as the name assumed by the firm of Peabody & Co., assumed after N. H. Warren & Co. had bought the partnership interest of Googins. And it is by a considerable stretch of liberality in the application of evidence that the items of Exhibit E can be considered in the case at all.

By the terms of the original partnership of Peabody, Perry, Scott & Co., Peabody, or such member of the firm as should devote his entire time to its business, was entitled

to draw out not to exceed $100 monthly, and this provision was continued throughout the changes down to Peabody & Co., and subsequently to James Peabody & Co. From September 30, 1885, when the plaintiffs took the place of Googins, to August 1, 1886, a period of ten months, Peabody was accordingly entitled to draw out and use on his personal account the amount of $1,000 *prima facie*, and in the absence of evidence to the contrary, not furnished by the record, these checks must be presumed to have been drawn, and the amount thus represented to have been from the partnership funds under and by virtue of that authority. The record therefore fails to show that partnership funds in which the plaintiffs had an interest were subverted and used either in the purchase of the lots or the erection and completion of the house on the premises in controversy. When the plaintiffs bought out the interest of Googins they must be presumed to have had full knowledge of the condition of the partnership accounts as between Peabody and Googins, and, in point of fact, the evidence shows that they did know and were satisfied with such conditions at the time; and it is obvious, from the evidence that the chief, if not the only, cause of dissatisfaction arose from the failure of Peabody to fully realize the claims which he represented to have upon the railroad company for rebates on transportation. His overdrafts on the funds of Peabody & Co., before the purchase of the plaintiffs of the interest of Googins, I regard as a personal debt to the firm of James Peabody & Co., in which the plaintiffs have an interest but which in their hands bears no impress of a fiducial character. Upon a settlement between the members of that firm, and the ascertainment of the amount due from Peabody to the firm and its liquidation by judgment, the plaintiffs would have the ordinary process of a creditor's bill to subject the individual property of Peabody, in whosesoever hand the same might be, to the payment of it.

To this view of the case the authorities from this court

cited by counsel for the appellees are applicable; (*Weil v. Lankin*, 3 Neb., 387; *Weinland v. Cochran*, 9 Id., 482; *Crowell v. Horacek*, 12 Id., 625.) It having been decided, in the cases cited, that "a mere general creditor, who has not reduced his claim to judgment, cannot maintain an action to enjoin a debtor from transferring his property."

It is not my intention, in this opinion, to pass upon the general proposition argued by counsel for appellants "that where property held upon any trust to keep or use or to invest in a particular way is misapplied by the trustee and converted into different property, or is sold, and the proceeds are then invested, the property may be followed wherever it can be traced through its transformations, and will be subject when found in its new form to the rights of the original owner;" but only to sustain the findings and decision of the district court "that the allegations of the petition, in this respect, are not supported by the proof." It is therefore deemed unnecessary to discuss either the evidence or the law especially applicable to the mortgage executed by the defendant Peabody and his wife to the defendant Williams, or any other issue arising in the case.

The decree of the district court is affirmed.

DECREE AFFIRMED.

THE other Judges concur.